**VIRGINIA:**

**IN THE CIRCUIT COURT FOR THE COUNTY OF ARLINGTON**

MONIQUE SHENELL FORD,
ADMINISTRATOR OF THE ESTATE OF
DARRYL TERRELL BECTON, DECEASED,

       Plaintiff,

      Case: _CL22-870_

v.

      **JURY TRIAL DEMANDED**

CORIZON HEALTH, INC.,

      Serve Defendant Corizon Health, Inc. at:

      CT Corporation System (Registered Agent)
      4701 Cox Road, Suite 285
      Glen Allen, VA 23060
      (Henrico County)

RICHARD ASHBY, MD,

      Serve at:

      1435 North Courthouse Road
      Arlington, VA 22201

LOIS NTIAMOAH, RN,

      Serve at:

      6850 Richmond Hwy, Apt. 436
      Alexandria, VA 22306-1765

NATASHA TOY, RN,

      Serve at:

      4842 Kenmore Avenue, Apt. 303
      Alexandria, VA 22304-1151

ANTOINE SMITH, LPN,

      Serve at:

      5500 Columbia Pike, Apt. 1018
      Arlington, VA 22204

EXHIBIT

1

ALL-STATE LEGAL®

SHERIFF ELIZABETH ("BETH") ARTHUR, and

DEPUTY SEATON SOK,

>Serve Defendants Arthur and Sok at:

>Arlington County Sheriff's Office
>Arlington County Justice Center
>1425 N. Courthouse Rd., Suite 9100
>Arlington, VA 22201

>>Defendants.

## COMPLAINT

Plaintiff Monique Shenell Ford, Administrator of the Estate of Darryl Terrell Becton, Deceased, by counsel, moves this Honorable Court for judgment against Corizon Health, Inc.; Richard Ashby, MD; Lois Ntiamoah, RN; Natasha Toy, RN; Antoine Smith, LPN; Sheriff Elizabeth ("Beth") Arthur; and Deputy Seaton Sok, and in support of her Complaint, states as follows:

## I.   INTRODUCTION

1.     At around 4:00 p.m. on October 1, 2020, Darryl Becton, age 46, was found unresponsive at the Arlington County Detention Facility ("ACDF," "the Facility," and/or "the Jail") and pronounced dead shortly thereafter. Mr. Becton's death – one in a number of disturbing recent deaths of African American detainees/inmates at ACDF – was wholly avoidable.

2.     Mr. Becton suffered from opiate addiction. When processed into ACDF midday on September 29, 2020, Mr. Becton told both Sheriff's deputies and Corizon Health, Inc. employees that he had recently used opiates and, as a result, would undergo withdrawal. Mr. Becton also disclosed that he suffered from hypertension (high blood pressure) and heart problems. Despite knowing of Mr. Becton's impending withdrawal – described by many as the worst type of sickness that they had ever experienced – Corizon Health, Inc. employees failed to prescribe and carry out a

proactive withdrawal treatment regime and also botched the implementation of a standard opiate withdrawal scoring protocol known as "COWS."

3.    Very early on the morning of October 1, 2020, Corizon Health, Inc. employees recorded an alarmingly high blood pressure for Mr. Becton. At the time, Mr. Becton told Defendant Lois Ntiamoah, RN, "I am withdrawing from heroin and fentanyl." Thereafter, Defendants Ntiamoah, RN, and Natasha Toy, RN observed and/or recorded that Mr. Becton began to vomit profusely and complained of nausea, debilitating body aches,[1] headaches, tremors, and diarrhea, among other symptoms. The nurses also noted that Mr. Becton's eyes appeared, "Pale." As evidenced by his signature on these nursing notes, Defendant Ashby, MD was aware of Mr. Becton's condition on October 1, 2020.

4.    At 6:59 a.m. on October 1, 2020, an incomplete set of vitals was taken by an unidentified Corizon Health, Inc. employee. Thereafter, all monitoring, observations, and treatment of Mr. Becton simply ceases. Mr. Becton's medical record contains a recorded encounter at 2:34 p.m., but that alleged encounter is highly dubious. Defendant Antoine Smith – a licensed practical nurse and Corizon Health, Inc. employee – has been criminally charged with falsifying patient records, upon information and belief, in connection with Mr. Becton.

5.    In the morning and early afternoon preceding Mr. Becton's death, Defendant Sok and other deputies performed — or claim to have performed — numerous visual rounds of the Medical Unit, during which, they were supposed to check on the well-being, safety, and health of Mr. Becton. However, neither Defendant Sok nor any other deputy took any action to aid the acutely and obviously ill Mr. Becton.

---

[1] Mr. Becton rated his body aches as a "9" out of a possible maximum score "10" when describing his pain.

6.     A 4:16 p.m. on October 1, a counselor visiting the Medical Unit approached the cell where Mr. Becton was housed. The counselor knocked on the cell door, but got no response. When personnel entered the cell, Mr. Becton was unresponsive and "cool to touch," and would be pronounced dead a half hour later by EMS personnel who responded to the scene.

7.     The Office of the Chief Medical Examiner concluded that Mr. Becton died from hypertensive cardiovascular disease complicated by opiate withdrawal. Had Mr. Becton been transported to an Arlington area hospital earlier that day (October 1), he would not have died.

**II.     JURISDICTION**

8.     Jurisdiction exists in this case pursuant to Virginia Code § 8.01-50 *et seq.* (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq.* (survival statute). All relief available under the foregoing statutes is sought herein by Plaintiff.

**III.     VENUE**

9.     Venue is proper in this Court pursuant to Virginia Code § 8.01-262(4) as the cause of action arose in Arlington County.

**IV.     PARTIES**

10.     Plaintiff MONIQUE SHENELL FORD is, and was at all relevant times, a resident of the District of Columbia. On October 18, 2021, Monique Shenell Ford duly qualified as Administrator of the Estate of Darryl Terrell Becton, Deceased, in the Arlington Circuit Court, under the applicable provisions of law. A copy of the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A**. Plaintiff brings this action in her capacity as ADMINISTRATOR OF THE ESTATE OF DARRYL TERRELL BECTON, DECEASED, pursuant to, among other statutes, Virginia Code § 8.01-50 *et seq.* (wrongful-death statute), and, alternatively, pursuant to Virginia Code § 8.01-25 *et seq.* (survival statute). All relief available under the foregoing statutes is sought herein by Plaintiff.

11. Defendant CORIZON HEALTH, INC. (hereinafter Defendant "Corizon") is a corporation organized under the laws of Tennessee with its principal office in Brentwood, Tennessee, and with operations in Virginia. Corizon has its operations in the County of Arlington, Virginia at ACDF, as well as at other locations in the Commonwealth of Virginia. At all relevant times hereto, Corizon had a contract with Arlington County. By contract, Corizon assumed responsibility for the provision of on-site medical services to all inmates/detainees at ACDF to be provided within the standard of care and adhering to the rights inmate/detainees have to medical care while in the custody of the Sheriff. Defendant Corizon was paid in excess of $3.55 million per year to provide healthcare services at the Jail. Of particular relevance to this case, by contract, during the relevant period, Corizon agreed to:

- "ensure" that it and its agents and employees complied with the standard of care;

- "perform examinations and provide physician services including specialist services for inmates";

- provide healthcare services consistent with American Correctional Association and Virginia Department of Corrections' standards;

- on a daily and 24-hour basis, provide health care services for a 12-bed medical unit; and

- provide medication rounds three times a day, seven days a week.

Additionally, Corizon agreed to indemnify Arlington County and its elected officers and employees from all claims arising out of, or in any way connected with, Corizon or its employees' acts or omissions. Defendant Corizon and its employees/agents, at all relevant times, provided services to Arlington County and the Sheriff as an independent contractor.

12. Defendant RICHARD ASHBY, MD, was, at all relevant times hereto, a medical doctor and an employee, agent, and/or servant of Defendant Corizon. At all relevant times hereto, Defendant Ashby was acting within the course and scope of his employment and/or agency with Corizon and under color of state law. During the relevant period of time, Defendant

Ashby, MD, served as "Medical Director" of ACDF. As Medical Director at ACDF, Defendant Ashby, MD, assumed responsibility for the "provision of medical care in ACDF." As Medical Director, Defendant Ashby, MD was further responsible for the performance of Corizon's "clinical coordination of all medical program staff," to include all additional physicians, RNs, and LPNs. Additionally, as Medical Director, Defendant Ashby, MD, was required to "conduct medication and chart review and establish policies and procedures for the medical program described therein."

13.     Defendant LOIS NTIAMOAH, RN, was, at all relevant times hereto, a registered nurse and an employee, agent, and/or servant of Defendant Corizon employed at ACDF. At all relevant times hereto, Defendant Ntiamoah was acting within the course and scope of her employment and/or agency with Corizon and under color of state law.

14.     Defendant NATASHA TOY, RN, was, at all relevant times hereto, a registered nurse and an employee, agent, and/or servant of Defendant Corizon employed at ACDF. Upon information and belief, during the relevant time period, Toy, RN served as "Director of Nursing" at the Facility. According to Corizon's contract with Arlington County, the position oversees nursing services in support of medical plans. At all relevant times hereto, Defendant Toy was acting within the course and scope of her employment and/or agency with Corizon and under color of state law.

15.     Defendant ANTOINE SMITH, LPN, was, at all relevant times hereto, a licensed practical nurse and an employee, agent, and/or servant of Defendant Corizon employed at ACDF. At all relevant times hereto, Defendant Smith was acting within the course and scope of his employment and/or agency with Corizon and under color of state law.

16.     Defendant SHERIFF ELIZABETH ("BETH") ARTHUR was, at all relevant times, the duly elected Sheriff of Arlington County, Virginia. As such, she was/is responsible

for the care and custody of the detainees and inmates committed to the custody of the ACDF and has the obligation to monitor and direct Corizon activities conducted at ACDF on her behalf. Defendant Arthur is a constitutional officer independent of Arlington County. She is the commanding officer of all deputies and employees under her command. She is responsible for the training, supervision, and conduct of all deputies and employees under her command, and for promulgating policies and customs regarding the training and supervision of such deputies and employees. She was/is responsible by law for the operation of the Facility, for enforcing the regulations of the Arlington County Sheriff's Office, and for ensuring that personnel under her command obey the laws of the Commonwealth of Virginia and the United States. Defendant Arthur was/is vested with the responsibility to hire, train, and supervise employees, to set and enforce policies and procedures, and to provide for the safety, protection, and health of those confined in the Facility, including Mr. Becton.

17.     Defendant SEATON SOK was, at all relevant times, a Sheriff's deputy acting within the course and scope of his employment and under color of state law. On October 1, 2020, Sok's assignment was "Medical Deputy." From 7 a.m. on October 1, 2020, until approximately 4:16 p.m. that day, when Mr. Becton was found unresponsive in his cell, Deputy Sok was required to monitor and ensure the health and safety of those in the Medical Unit. On October 1, Defendant Sok documented at least 18 separate events, including conducting 15 "Visual Round[s]," supervising food tray distribution and collection, and conducting two "Head Count[s]," each of which should have necessitated a personal interaction with Mr. Becton. Deputy Sok is sued in his individual capacity. Deputy Sok is, and at all relevant times was, an adult resident of the Commonwealth of Virginia.

18.     Facility records indicate that, in addition to individually named Defendant Deputy Sok, Deputies Robinson (Sgt.), Foster (Sgt.), Kirkland, Laureano, Vilchez, and Colon were

7

employed as deputies working at the Facility on or about October 1, 2020. Records show that each had rounding and/or supervisory duties in the Medical Unit that day. The Medical Unit, comprised of cells that housed ill inmates, was not dissimilar to the standard cells wherein inmates were housed. Like the standard ACDF housing units, the aforementioned deputies were responsible for conducting visual rounds to confirm the inmates' safety. Likewise, the deputies were often called upon to assist in the daily requirements of the Medical Unit including, but not limited to, delivering/overseeing the delivery of food to the inmates, conducting headcounts, and admitting nursing staff into locked cells. Notably, as discussed below, when a Mr. Becton was discovered unresponsive in his cell by a Department of Human Services employee, a deputy, as opposed to a nurse, was summoned by Defendant Nurse Smith to unlock the cell door. The following deputies recorded in the logbook the following number of visual rounds in the Medical Unit (in addition to other activities such as meal tray service, which would have also likely caused them to observe Mr. Becton's condition): Colon (7), Kirkland (4), Laureano (2), and Vilchez (2). Additionally, Sgt. Robinson three times appeared on the post for unannounced visual rounds. Incident to their rounding and/or supervisory duties, each did or should have surveilled Mr. Becton, and all had an obligation to obtain medical aid for Mr. Becton given his observable acute medical condition. At all relevant times, the foregoing Deputies were deputies, employees and/or agents of the Sheriff. Plaintiff's state-law claims against Defendant Sheriff Arthur include the actions/inactions of the foregoing Deputies, as well as the actions/inactions of individually named Deputy Sok. Under the doctrine of *respondeat superior* liability, Defendant Sheriff Arthur is legally responsible for the actions and inactions of these deputies performed in the scope of their employment/duties with the Arlington County Sheriff's Office.

## V. FACTS

19. The Intake staff, medical/nursing professionals, and Sheriff's Office employees assigned to evaluate inmates arriving at the Facility, were informed by Mr. Becton that he had recently used opiates and would likely experience withdrawal. Despite being placed in the Medical Unit, Mr. Becton was ignored up to his last breath.

20. The Arlington County Police Department investigated Mr. Becton's death, and, as a result of that investigation, Defendant Antoine Smith, LPN, was charged with falsifying a patient record with the intent to defraud in violation of Virginia Code Section 18.2-260.1. Currently, which file or files within Mr. Becton's records were falsified is not public information.

### A. The Days Prior to Mr. Becton's Untimely Death

21. Darryl Becton was admitted into ACDF on September 29, 2020, at approximately 12:24 p.m. As a part of the standard intake procedure for ACDF, Mr. Becton underwent separate intake screenings by Sheriff's deputies and then Corizon staff. At each screening, Corizon and Jail personnel knew that Mr. Becton was at high risk of opiate withdrawal, which can result in death.

22. At 2:27 p.m., Sheriff's Deputy Barnes recorded, "[Mr. Becton] used opium in the past 24 hours and believes he will experience withdrawals."[2] Barnes additionally noted that Mr. Becton had "hypertension and heart problems." The combination of hypertension, heart problems, and anticipated heroin/fentanyl withdrawal required heightened surveillance of Mr. Becton by ACDP deputies, which, as discussed below, he did not receive.

---

[2] The quote is as noted in the Inmate Activity Log; Barnes recorded "opium" rather than "opiate," which likely is what Mr. Becton actually reported.

23. At 2:39 p.m., Corizon staff member Teferi Fikre-Miriam, RN conducted an Intake and Receiving screening of Mr. Becton. During this screening, Mr. Becton again disclosed a history of substance abuse, including daily usage of injectable drugs, with his most recent injection the day prior. Mr. Becton reported a history of heroin dependency and opiate withdrawal to Nurse Fikre-Miriam. "Hx [History] of withdrawal" was checked by Fikre-Miriam, RN on Mr. Becton's Intake and Receiving Screening form. Mr. Becton, once again, disclosed that he suffered from hypertension (high blood pressure) and heart problems.

24. On assessment, Nurse Fikre-Miriam noted a bilateral lower extremity edema of +3.[3] She recorded in the electronic medical record, "Expedited practitioner sick call scheduled for 9/30/20." The significant swelling in Mr. Becton's legs was never addressed by Defendant Ashby, MD, the Corizon nursing staff, or the Sheriff's deputies.

25. In response to Mr. Becton's disclosures, Nurse Fikre-Miriam wrote on Mr. Becton's electronic medical record that she was initiating Clinical Opiate Withdrawal Scale ("COWS") protocol, including regular assessments and blood pressure checks. COWS protocol is a means of measuring symptoms of opiate withdrawal over a period of time. The protocol generally requires medical personnel to regularly assess a patient and assign numerical ratings to common signs and symptoms of opiate withdrawal. The summed score is used to assess a patient's level of opiate withdrawal.

26. However, Nurse Fikre-Miriam appears to have selected the "CIWA" protocol – an alcohol withdrawal scale – even while charting an order for opiate withdrawal assessments. In any event, the COWS protocol was not completed that afternoon and at other times while Mr. Becton was in custody. Only one entry was made reflecting any attempts by the nursing staff to adhere to COWS protocol.

---

[3] Edema is swelling caused by excess fluid trapped in the body's tissues.

27. After Mr. Becton's initial encounters with nursing staff, two entries[4] were submitted by Corizon health personnel to reflect their interactions with Mr. Becton on September 29, 2020.

28. At 2:58 p.m., Nurse Fikre-Miriam recorded Mr. Becton's vitals which included: a temperature of 98.8°F, a pulse of 63 beats per minute, a respiratory rate of 16 breaths per minute, a blood pressure of 127/79, and an oxygen saturation level of 98%.

29. On September 30, 2020, Mr. Becton appeared in court at approximately 9:00 a.m.

30. After appearing in court, Mr. Becton was officially booked into ACDF. As part of Mr. Becton's Initial Classification, Deputy Watkin recorded, "According to I/M's history and ACDF interviews: I/M reported High Blood Pressure and Heart Related Illness/medical issues. Inmate reported recent Opioid usage/possible withdrawals/substance abuse issues."

31. Deputy/employee Boroff recorded that Mr. Becton **returned to ACDF at 10:30 a.m.** and the foregoing Initial Classification entry was made at 11:44 a.m.

32. However, Defendant Antoine Smith, LPN recorded a "Health Service Encounter" documenting that he **visited Mr. Becton's cell at around 9:50 a.m.** on September 30, 2020, writing, "Pt. observed in cell, movement noted, No acute distress noted." This entry by Defendant Smith, LPN was entered late, at 3:30 p.m., about five hours after his alleged encounter with Mr. Becton.[5] The notation by Deputy/employee Boroff noted above calls into question whether this is the entry that Defendant Smith, LPN's allegedly falsified and what the actual condition of Mr. Becton was at that time.

---

[4] One other entry from Corizon employee Christian Engmann, LPN simply states, "MOVEMENT NOTED" on September 29, 2020, at 9:15 a.m.; however, this entry contradicts the timeline. According to other documents from the jail, Mr. Becton did not enter the ACDF facility until approximately noon on September 29. Furthermore, though the entry was opened midmorning, it was not closed until 4:25 p.m.

[5] Defendant Smith, LPN's entry was updated again at 6:20 p.m. on September 30.

33.     Despite explicit directives from Registered Nurse Fikre-Miriam to follow the COWS protocol and record Mr. Becton's blood pressure, none of the notes included in Mr. Becton's records reflect any vital signs from September 30 – the day prior to his death.

**B.     The Day of Mr. Becton's Death (October 1, 2020)**

34.     At 4:33 a.m.[6] on October 1, 2020, Letonia Levister, LPN, and Defendant Ntiamoah, **recorded an alarmingly high blood pressure of 191/102** for Mr. Becton.

35.     Six minutes later, Nurse Levister took a complete set of vitals for Mr. Becton, revealing, in part, a pulse of 52 beats per minute and a blood pressure of 191/102. Mr. Becton, despite being prescribed medication to treat high blood pressure, was suffering a hypertensive emergency – a severe increase in blood pressure that can lead to stroke and/or a heart attack.

36.     Forty-six minutes after the Corizon employee documented Mr. Becton's hypertensive emergency, at 5:19 a.m., Defendant Ntiamoah provided Mr. Becton Tylenol, Pepto Bismol, Clonidine (an anti-hypertensive medication, but it was ordered as a low dose only "as needed" as part of the protocol, **not per the regular treatment regime that Mr. Becton identified at intake)**,[7] Lorazepam (used to treat anxiety), and Promethazine HCL (used to treat, among other things, nausea). The Corizon medical and nursing staff did not provide Mr. Becton the anti-hypertensive medication treatment regime that he disclosed at intake. This is highly notable in the context of Mr. Becton's cause of death – characterized by the medical examiner as "from **hypertensive** cardiovascular disease **complicated by opiate withdrawal**." (Emphasis added.).

---

[6] Although certain Corizon medical records indicate that the highly aberrant blood pressure reading of 191/102 was recorded at 4:33 a.m., other Corizon records note that the reading was taken at 1:33 a.m. Subsequent abnormal blood pressure and other vital signs recorded that day (October 1, 2020) also bear different time stamps that are approximately three hours apart.

[7] A Medication Administration Record indicates that Mr. Becton received 0.3 mg. of Clonidine at 5:50 a.m.

37. At 5:23 a.m., Mr. Becton's vitals were taken again: a temperature of 98.5°F, a pulse of 49 beats per minute, a respiration rate of 18 breaths per minute, and a blood pressure of 183/90 recorded, still dangerously high and requiring prompt medical intervention.

38. At 5:24 a.m., Defendant Ntiamoah documented in the medical record, Mr. Becton stating, "I am withdrawing from heroin and fentanyl."

39. At approximately 5:27 a.m., Mr. Becton was admitted to the Medical Unit. Nurse Ntiamoah cited Dr. Ashby as the "Admitting Practitioner" with "Chief Complaint: detox/withdrawal from heroin and fentanyl."

40. At 5:43 a.m., in contravention of the now two-day old order to routinely administer the COWS protocol, Defendant Ntiamoah recorded, "Initiate COWS protocol." As noted above, though Nurse Fikre-Miriam selected to initiate CIWA protocol, she had explicitly written in her notes to begin COWS protocol two days earlier. No Corizon employee would properly comply with Ntiamoah, RN's 5:43 a.m. directive.

41. Ten minutes later, and over an hour after Mr. Becton was recorded as being in hypertensive emergency, Defendant Ntiamoah, RN wrote in Mr. Becton's Health Encounters, "A&OX3, vital signs elevated. Inmate had several emesis, c/o body aches 9/10, was yawning during encounter. COWS =5 for nausea/vomiting, body aches, GI upset, and yawning." This incomplete COWS assessment revealed the escalating crisis and symptoms suffered by Mr. Becton.

42. In another entry at 5:49 a.m., Defendant Ntiamoah, RN either did not perform a COWS assessment or did not carry out a complete assessment. Defendant Ntiamoah describes Mr. Becton's symptoms again citing, "Tremors, Nausea/vomiting/diarrhea, Yawning, Bone aches, Headache" and depicted Mr. Becton's eyes as "Pale." **An extremely high blood pressure and headache are warning signs of hemorrhagic stroke and cardiovascular emergency.**

The headache can indicate intracranial hemorrhaging (bleeding inside the skull). Mr. Becton's signs and symptoms indicated a clear medical emergency requiring a call to 911. But such was not done, and Mr. Becton would pay for this malfeasance with his life.

43.     Later, at 6:59 a.m., an incomplete set of vitals was taken by an unidentified Corizon nurse. These vitals showed that Mr. Becton had a blood pressure of 151/76 and a pulse of 68 beats per minute.[8] These would be the **last vital signs taken of Mr. Becton in the last 9 hours of his life**. Vital signs are an important component of the COWS protocol, but such was wholly disregarded by the Corizon staff.

44.     At approximately the same time, ACDF records indicate that Jail supervisors began making Unannounced "Visual" Rounds in the Medical Unit. These supervisors would have likely encountered Mr. Becton and become aware of his acute condition noted above.[9]

45.     At 7:11 a.m., Medical Deputy Sok conducted a "head count" in Medical Area.

46.     At 7:38 a.m., Defendant Smith, LPN noted that Mr. Becton can be observed, "ASLEEP IN BED AT THIS TIME, MOVEMENT NOTED, NO ACUTE DISTRESS NOTED. WILL CONTINUE TO OBSERVE."

47.     A logbook indicates that at 9:10 a.m. Sergeant T. Robinson and Sergeant Foster conducted rounds in the Medical Unit. Like the supervisors who conducted rounds of the Medical Unit two hours earlier, they too would have likely encountered Mr. Becton and learned of his emergent condition (if they had not already been informed of such).

---

[8] The decreased blood-pressure reading could be attributable to poor circulation.

[9] The physical state of a person in withdrawal (tremors, sweating, etc.), the odor and sounds of the diarrhea and "profuse" vomiting noted by Corizon nursing staff that morning, and the information given to ACDF staff at intake, and, presumably, communications from medical/nursing staff regarding his condition, each, together or separately, placed the deputies and their supervisors on notice that Mr. Becton was at risk and needed careful monitoring, if not hospitalization.

48.     In a note (entered at 2:30 p.m.) describing Mr. Becton's condition at 9:40 a.m. –

Nurse Natasha Toy wrote, "Patient present in infirmary with hyperemesis due to substance abuse

withdrawal. Patient observed through cell window vomiting into the biohazardous bag."[10]

49.     At 11:36 a.m., over two hours after Defendant Ntiamoah assessed Mr. Becton and

started him on five medications, Dr. Richard Ashby signed off on the medical chart for Mr.

Becton. No evidence exists to suggest that Dr. Ashby ever examined – let alone saw – Mr.

Becton.

50.     During the time that Mr. Becton sat in his cell – throwing up and suffering –

Defendant Sok, among others, was tasked with conducting visual rounds of the Medical Unit

where Mr. Becton was housed. All deputies assigned to the Medical Unit were responsible for

visually confirming the safety and health of all inmates.

51.     Between 7:00 a.m. on the day of his death, October 1, 2020, and 4:18 p.m. when

Mr. Becton was found unresponsive, the records indicate that Defendant Sok allegedly

performed 14 visual rounds in the Medical Unit. Each of those rounds – if properly conducted –

would require Defendant Sok to see Mr. Becton's dire condition. There is no indication in the

records that Defendant Sok tried to aid the visibly ill Mr. Becton.

52.     No Jail or Corizon records mention any specific encounters with Mr. Becton at

lunch, however, the Office of the Chief Medical Examiner's Report states, "[t]he last interaction

the subject [Mr. Becton] had with a deputy was who dropped off food in his cell (~1230 hrs), at

which time the subject grunted at the deputy." The statement indicates that though Mr. Becton

was still responsive at approximately 12:30 p.m. on October 1, 2020, he was so ill that he could

not articulate a verbal response other than a grunt. Furthermore, this statement supports the

assertion that Mr. Becton was acutely ill, but no Jail deputies or Corizon employees were willing

---

[10] Hyperemesis refers to severe and prolonged vomiting.

to provide him aid or access to aid. Jail records indicated that Defendant Deputy Sok oversaw the October 1 lunch meal service.

53.     Mr. Becton's Jail medical records indicate that Mr. Becton allegedly "Refused" medications at 2:34 p.m. on October 1. The records do not indicate which Corizon employee marked that Mr. Becton had allegedly "Refused" medication. In a jail, inmate medication refusals are documented in a "medication refusal form" with the inmate and/or a witness (generally a deputy) signing to verify the refusal. Indeed, Corizon's contract with Arlington County required the same. However, no such forms exist concerning Mr. Becton's alleged medication refusal at 2:34 p.m. Plaintiff contends that the alleged refusal likely constitutes a falsified entry by a Corizon nurse/medication aide. As noted above, the Assistant Chief Medical Examiner noted, "[t]he last interaction the subject had was with a deputy who dropped off food in his cell (~1230 hrs), at which time the subject grunted at the deputy."

54.     If, however, a Corizon employee were to assert that they had a conversation with Mr. Becton 1 ¾ hours before being found unresponsive and 2 ¼ hours before being declared dead, Mr. Becton would have most certainly been exhibiting very open and obvious acute symptoms, mandating immediate medical intervention.

55.     At 3:07 p.m. – 1 ¾ hours before Mr. Becton would be declared dead – Defendant Sok conducted an unofficial head count in the Medical Unit. If we are to assume Defendant Sok performed his duties as intended, he took no action to aid an obviously suffering Mr. Becton.

56.     At 4:06 p.m., Department of Human Services employee Joe Burgess entered the Medical Unit. At 4:16 p.m., Burgess approached cell #7 where Mr. Becton was housed. Burgess then knocked on the cell door, but got no response. Thereafter, Defendant Smith, RN, Deputy Tate, and Burgess entered the cell and found Mr. Becton "not breathing," with "no pulse." A

pulse oximeter "read 43%"[11]; no pulse rate was exhibited. Mr. Becton was found to be "cool to touch."

57.     Over an hour and a half after the last rounds by deputies or command staff, and 12 hours after a hypertensive emergency was noted in his medical chart, at 4:48 p.m., Mr. Becton was pronounced dead by members of Medic 102 who responded to the scene.

58.     The Office of the Chief Medical Examiner concluded that Mr. Becton died from hypertensive cardiovascular disease complicated by opiate withdrawal – conditions disclosed by Mr. Becton during the intake process.

59.     On October 25, 2021, following a string of deaths at ACDF, the Arlington County Sheriff's Office announced that the County would be entering contract negotiations with a new medical services provider for the Facility.

## VI.     DUTIES AND BREACHES

### A.     Defendants owed various duties to Mr. Becton.

60.     At all times while Mr. Becton was detained at the Facility, he was in the custody and care of Defendant Sheriff Beth Arthur and her deputies, employees/agents, including, but not limited to, Defendant Sok, and Defendant Corizon, and its employees, including, but not limited to, Defendants Ntiamoah, Toy, and Smith.

61.     The Defendants owed duties to Mr. Becton. Among these duties, Defendants, and each of them, had statutory and common law duties of care to Mr. Becton, including affirmative duties to provide adequate medical care or access to adequate medical care.

62.     Pursuant to state statute, Defendant Sheriff Arthur was responsible for the day-to-day operations at the Facility and had the duty of care and custody for Mr. Becton while he was

---

[11] A normal level of oxygen is usually 95% or higher.

detained at the Facility. Va. Code § 53.1-95.8, incorporating by reference Va. Code §§ 53.1-116 *et seq*. and 15.2-1609.

63. Defendant Arthur, by and through her deputies, agents, and employees, including, but not limited to, Defendant Sok, and Defendant Corizon and its employees, including, but not limited to, Defendants Ashby, MD; Ntiamoah, RN; Toy, RN; and Smith, LPN, had specific statutory duties to provide, or provide access to, medical treatment to Mr. Becton under Va. Code § 53.1-126. Under that statute, the foregoing Defendants had a specific responsibility to inmates/detainees, in that "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life-threatening conditions." *Id.*

64. Moreover, Virginia legislative authority has also enabled various regulations, including, but not limited to, those requiring that 24-hour emergency medical care be made available to inmates and detainees. Va. Code §§ 53.1-68, 53.1-95.2; 6 VAC 15-40-360.

65. Corizon and its employees owed duties to render that degree of knowledge, skill, diligence, and care to Mr. Becton that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth of Virginia. In fact, Corizon marketed itself as providing "best in class service" and being the "best" at providing detention-based services.

66. All Defendants owed duties to Mr. Becton to exercise reasonable care in providing medical, nursing care, or correctional services, to Mr. Becton during his incarceration at the Facility.

67. All of the duties of all of the Defendants, and each of them, as described herein, were shared by the Defendants, individually and collectively.

**B.** **Defendants breached duties owed to Mr. Becton; Defendants' conduct and omissions violated clearly established statutory and Constitutional rights of which Defendants knew.**

68.    Notwithstanding the duties described above, the Defendants, individually, and/or through their agents and employees, and each of them, breached the duties they owed to Mr. Becton, and were negligent, grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent to Mr. Becton's care and needs.

69.    All Defendants failed to respond, and/or responded with deliberate indifference, to Mr. Becton's deteriorating medical situation.

70.    All Defendants breached their express duties as set forth in the statutes, rules, policies, and procedures applicable to the Defendants. Among other provisions, Defendants failed to comply with Section 53.1-126 of the Code of Virginia, which states that, with regard to detainees/inmates, "...medical treatment shall not be withheld for any ... serious medical needs, or life-threatening conditions."

71.    Thus, the Defendants violated: an express directive by the Virginia General Assembly to provide medical treatment for all serious medical needs or life-threatening conditions, the U.S. Constitution, as well as their individual expressed duties and responsibilities by failing to provide Mr. Becton with adequate medical care, and/or access to adequate medical care. Further delineating the breaches of duties by the medical defendants, Mr. Becton presented with known hypertensive issues and had been prescribed a variety of medications to mitigate his hypertension. No Corizon employee enacted his regular medication regimen to manage his hypertension. This omission directly contributed to his death.

72.    Indeed, the joint and several conduct of each of the Defendants, and/or of their agents and/or employees, alone or in combination, as aforesaid, was so wanton or dispatched

with such negligence as to evince a conscious disregard for the rights, health, and well-being of Mr. Becton.

73. Defendants' actions and omissions, in denying obvious and necessary care and attention to Mr. Becton, rose to the level of deliberate indifference to serious medical needs. Additionally, the several acts of negligence of each of the Defendants individually, when combined (as opposed to the group as a whole), had a cumulative effect showing a reckless or total disregard of Mr. Becton.

### c. Defendants' wrongful conduct and omissions caused Mr. Becton's worsening condition and death.

74. As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, and/or deliberately indifferent actions and omissions of the Defendants, Mr. Becton's condition worsened, he suffered great physical pain and mental anguish, and he died. Mr. Becton's worsening condition, great physical pain and mental anguish, and death constitute constitutional injuries.

75. As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, and/or deliberately indifferent actions and omissions of the Defendants, the surviving beneficiaries of Mr. Becton have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of decedent's society, companionship, comfort, guidance, kindly offices, and advice of their loved one, as well economic losses, and have incurred hospital, doctors', and related bills, as well as funeral expenses.

76. Mr. Becton's deteriorating condition and obvious medical distress required that he be promptly transferred to a hospital. Had the Defendants done so, Mr. Becton would not have died.

(The following counts are asserted cumulatively, or in the alternative, individually.)

## VII. COUNTS

## COUNT I

**Wrongful Death** *(and, In the Alternative, Survival Claim)*

### NEGLIGENCE

**(Against Defendants Corizon, Ashby, MD; Ntiamoah, RN; Toy, RN; and Smith, LPN)**

77.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff asserts his survival claim in the alternative to Plaintiff's wrongful-death claim.

78.     As described throughout this Complaint, Defendants Corizon, Ashby, MD; Ntiamoah, RN; Toy, RN; and Smith, LPN (the "Foregoing Defendants," in this count only), breached duties owed to Mr. Becton, and these breaches constituted negligence.

79.     The Foregoing Defendants owed duties to Mr. Becton to treat him in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment; however, the Foregoing Defendants breached the standard of care.

80.     Under the doctrine of *respondeat superior*, Defendant Corizon is legally responsible for the actions and inactions of its employees, including, but not limited to, Defendants Ashby, MD; Ntiamoah, RN; Toy, RN; and Smith, LPN, which were performed in the scope of their employment/duties with Corizon.

81.     As a direct and proximate cause of the negligence of the Foregoing Defendants, Mr. Becton suffered great physical pain, injury, and mental anguish.

82.     As a direct and proximate result of the negligence of the Foregoing Defendants, Mr. Becton died.

83.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Mr. Becton's injuries and death, the

Statutory Beneficiaries have sustained damages, including, but not limited to, reasonable funeral expenses.

84.     The Foregoing Defendants' negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT II

### Wrongful Death *(and, In the Alternative, Survival Claim)*

### GROSS NEGLIGENCE

### (Against all Defendants)

85.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff asserts his survival claim in the alternative to Plaintiff's wrongful-death claim.

86.     All Defendants had, among other duties, duties to exercise reasonable care with regard to Mr. Becton; however, the Defendants breached these duties.

87.     Defendants Corizon; Ashby, MD; Ntiamoah, RN; Toy, RN; and Smith, LPN also owed duties to Mr. Becton to treat him in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment; however, these Defendants breached the standard of care.

88.     Under the doctrine of *respondeat superior*, Defendant Corizon is legally responsible for the actions and inactions of its employees, including, but not limited to, Defendants Ashby, Ntiamoah, Toy, and Smith, which were performed in the scope of their employment/duties with Corizon. Defendant Arthur is similarly legally responsible for the actions and inactions of her employees, including, but not limited to, Defendant Sok, which were performed in the scope of their employment/duties with the Arlington County Sheriff's Office. *See* discussion above.

22

89. All Defendants were grossly negligent in that their actions and inactions, described throughout this Complaint, showed such a level of indifference to Mr. Becton so as to constitute an utter disregard of prudence, amounting to a complete neglect for Mr. Becton's safety. Additionally, as noted above, the several acts of negligence of *each* of the Defendants *individually*, when combined, had a cumulative effect showing a reckless or total disregard of Mr. Becton.

90. As a direct and proximate cause of the gross negligence of the Defendants, Mr. Becton has suffered great physical pain, injury, and mental anguish.

91. As a direct and proximate result of the gross negligence of the Defendants, Mr. Becton died.

92. As a direct and proximate cause of the gross negligence of the Defendants, which contributed to and was the proximate cause of Mr. Becton's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

      a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

      b)     Loss of services, protection, care, and assistance provided by the decedent.

93. As a direct and proximate cause of the gross negligence of the Defendants, which contributed to and was the proximate cause of Mr. Becton's injuries and death, the Estate of Mr. Becton sustained damages, including, but not limited to, reasonable funeral expenses.

94. The Defendants' gross negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT III

### Wrongful Death (*and, In the Alternative, Survival Claim*)
### WILLFUL AND WANTON NEGLIGENCE
### (Against all Defendants)

95.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff asserts his survival claim in the alternative to Plaintiff's wrongful-death claim.

96.     All Defendants had, among other duties, duties to exercise reasonable care with regard to Mr. Becton; however, the Defendants breached these duties. The Defendants had, among other duties, duties to obtain or provide access to prompt medical care for Mr. Becton's open and obvious condition, including transport to a hospital.

97.     Under the doctrine of *respondeat superior*, Defendant Corizon is legally responsible for the actions and inactions of its employees, including, but not limited to, Defendants Ashby, MD; Ntiamoah, RN; Toy, RN; and Smith, LPN, which were performed in the scope of their employment/duties with Corizon. Defendant Arthur is similarly legally responsible for the actions and inactions of her employees, including, but not limited to, Defendant Sok, which were performed in the scope of their employment/duties with the Arlington County Sheriff's Office. *See* full discussion above.

98.     The Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Complaint, consciously in disregard of Mr. Becton's rights. In addition, the Defendants acted, or failed to act, in the manner described throughout this Complaint, with a reckless indifference to the consequences to Mr. Becton when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would result in injury to Mr. Becton. As a direct and proximate cause of the willful

and wanton negligence of the Defendants, which contributed to and was the proximate cause of the death herein complained of, Mr. Becton suffered great physical pain, injury, and mental anguish.

99.     As a direct and proximate result of the willful and wanton negligence of the Defendants, Mr. Becton died.

100.    As a direct and proximate cause of the willful and wanton negligence of the Defendants, which contributed to and were the proximate cause of Mr. Becton's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to: sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and loss of services, protection, care, and assistance provided by the decedent.

101.    As a direct and proximate cause of the willful and wanton negligence of the Defendants, which contributed to and were the proximate cause of Mr. Becton's injuries and death, the Estate of Mr. Becton sustained damages, including, but not limited to: expenses for the care and treatment of the decedent incidental to the injury resulting in death, and reasonable funeral expenses.

102.    The Defendants' willful and wanton negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff. Also, the foregoing willful and wanton negligence claim supports, and Plaintiff seeks, the imposition of significant punitive damages against the individual defendants.

## COUNT IV

### DEPRIVATION OF CIVIL RIGHTS –
### FOURTEENTH AMENDMENT / 42 U.S.C. § 1983

### (DENIAL, DELAY, AND WITHHOLDING OF MEDICAL CARE)
### (Against Defendants Ashby, MD; Ntiamoah, RN; Toy, RN; Smith, LPN; and Sok)

103.　Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

104.　At all times relevant to the allegations in the Complaint, Defendants Ashby, MD; Ntiamoah, RN; Toy, RN; Smith, LPN; and Sok (the "Foregoing Defendants," in this count only), acted or failed to act under color of state law.

105.　The Fourteenth Amendment to the United States Constitution affords pretrial detainees the right to receive treatment for serious medical needs.

106.　As described herein, the Foregoing Defendants failed to provide access to necessary medical care, to include medical treatment, in response to obvious, serious medical needs.

107.　The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Mr. Becton's health and safety, thereby placing Mr. Becton in substantial risk of serious harm.

108.　At numerous times throughout the course of his confinement, the Foregoing Defendants knew that Mr. Becton had serious medical needs that were not being met. Despite such knowledge, the Foregoing Defendants failed to reasonably respond.

109.　The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

110.　As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Becton was injured in various respects, including, without limitation, suffering physical injuries

and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Fourteenth Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

111. As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Becton died.

112. The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mr. Becton's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

113. The Foregoing Defendants' violations of the Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorneys' fees, and costs to the Estate of Mr. Becton.

## VIII.  JURY TRIAL DEMANDED

114. Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against each of the Defendants, specifically, Defendants Corizon Health, Inc.; Richard Ashby, MD; Lois Ntiamoah, RN; Natasha Toy, RN; Antoine Smith, LPN; Sheriff Elizabeth ("Beth") Arthur; and Deputy Seaton Sok; jointly and severally, in the amount of $ 10 million ($10,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, and as to the individual Defendants pursuant to Counts III. and IV., punitive damages, and as to Count IV., attorney's fees, and such other and further relief that this Honorable Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

MONIQUE SHENELL FORD,
ADMINISTRATOR OF THE ESTATE OF
DARRYL TERRELL BECTON, Deceased,

By: _____
Counsel

Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
Truist Place
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
*Counsel for Plaintiff Monique Shenell Ford, Administrator of the Estate of Darryl Terrell Becton, Deceased*



**State of Virginia**
**County of Arlington** } *To-wit:*

**EXHIBIT**

A

#W39000



## *Qualification Certificate for Small Asset Estate*

*To All to Whom These Presents Shall Come, Greeting:*

I, Paul Ferguson, Clerk of the Circuit Court of Arlington County, Virginia, the same being a

Court of Probate and of Record and having a seal, do hereby certify that it appears of record in my office

pursuant to law that: On the Eighteenth day of October, Two Thousand Twenty-One

the said         MONIQUE SHENELL FORD

of         WASHINGTON, D.C.

duly qualified as         ADMINISTRATOR (Qualification pursuant to Section 64.2-454)

for the estate of DARRYL TERRELL BECTON, deceased, having first entered into bond in the penalty of One Hundred Dollars ($100.00) without approved security for the faithful performance of the duties thereof. No security required under the provisions of Section 64.2-1411 of the 1950 Code of Virginia, as amended. The power of the fiduciary(ies) named above continue in full force and effect. *The maximum amount of estate assets that may be collected pursuant to this certificate shall not exceed $25,000. Any person may pay or deliver to the fiduciary named in this certificate any asset belonging, owed, or distributable to the specified deceased person having a value, on the date of payment or delivery, of no more than $25,000. This certificate may be used only once and is not effective if it does not have an impression seal of the court clerk. Photocopies of this certificate are not effective. The payor shall retain possession of this certificate.*

In Testimony Whereof I, PAUL FERGUSON, Clerk of said Court, have hereunto subscribed my name and affixed the Seal of said Court this 18th day of October, 2021

Teste: PAUL FERGUSON, CLERK

By: _____ Deputy Clerk