**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|   |   |
|---|---|
| **MONIQUE SHENELL FORD,** **ADMINISTRATOR OF THE ESTATE OF** **DARRYL TERRELL BECTON.,** *deceased,* )<br><br>**Plaintiff,** )<br>v. )<br><br>**CORIZON HEALTH, INC.,** *et al.* ) | Case No.: 1:22-cv-00411-RDA-TCB |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS CORIZON HEALTH, INC., RICHARD ASHBY, MD, LOIS NTIAMOAH, RN AND NATASHA TOY, RN

Defendants, Corizon Health, Inc., Richard Ashby, MD, Lois Ntiamoah, RN, and Natasha Toy, RN (collectively the "Defendants") respectfully move this court for summary judgment as to all claims. On October 29, 2020, the deceased, Mr. Darryl Becton, was incarcerated for violation of probation in the Arlington County Detention Facility (ACDF). Upon intake, Corizon's intake RN Teferi assessed Mr. Becton. He reported using opioids, but he was not experiencing withdrawal symptoms. Nurse Teferi placed Mr. Becton on a protocol called COWS, a systematic way to monitor a patient for symptoms of opiate withdrawal. Less than two days later, very early in the morning on October 1, 2020, Mr. Becton began having withdrawal symptoms. LPN Levister checked his blood pressure which was elevated. Corizon RN Ntiamoah ordered him to be moved to the Infirmary. She assessed him, administered five medications to him per a physician-ordered protocol, and called the doctor ( at his home around 4:30 am.) On Dr. Ashby's orders, Mr. Becton was admitted to the Infirmary. Nurse Ntiamoah checked his vitals again and he appeared to be resting in no distress and his blood pressure was greatly reduced. Subsequently he was monitored

by medical staff. Numerous rounds were conducted by sheriff's deputies checking on Mr. Becton. He never asked for help even though his cell was right near the nurse's station. Thereafter, Mr. Becton was found dead in his cell at about 4 p.m. The autopsy stated that he died of heart disease complicated by opiate withdrawal. These facts do not make a *prima facie* showing of deliberate indifference and instead show consistent affirmative interventions taken by defendants. Mr. Becton's demise succumbing to heart arrythmia was totally unexpected. Accordingly, summary judgment should be entered in favor of defendants on Count IV, deprivation of Civil Rights (there is no allegation that Corizon is liable under this count).

Additionally, there was no egregious conduct required to sustain a claim for gross negligence nor willful wanton conduct to warrant an award for punitive damages. Therefore, summary judgment should be entered for defendants for Count II (Gross Negligence) and Count III Willful and Wanton Negligence.

Lastly, summary Judgment should be entered on the state law malpractice claim against defendants because Plaintiffs' experts do not have clinical experience in a similar discipline required under the Virginia Statutes. These arguments are made in the accompanying *motion in limine* and in codefendant's Smith Motion to Strike Plaintiff's expert.

I. **Statement of Undisputed Facts**

The deceased, Mr. Darryl Becton, had a longstanding history of opiate use and withdrawal, since at least 2017. (SA 000200). He was incarcerated on several prior occasions in the ACDF before the events in this case.

On September 29, 2020, Mr. Becton was arrested for failure to follow his probation officer's instructions and for absconding from supervision relating to a felony conviction of 9/26/19 for unauthorized use of a motor vehicle.

Accordingly, Mr. Becton was booked at ACDF. At 2:26 pm, Corizon RN Teferi performed an intake screening of Mr. Becton. (SA 000082). Mr. Becton reported using heroin maybe 1 gram daily, with the last use 9/28/20. (SA 000246-SA000248). Nurse Teferi placed Mr. Becton on a COWS protocol, a systematic way of checking for withdrawal symptoms. Additionally, since Mr. Becton's vital signs were in the normal range and he was in no apparent distress and not experiencing withdrawal symptoms, Nurse Teferi recommended that he be placed in the general population. (Teferi depo., pp.39, 126). Nurse Teferi set up an expedited sick appointment for swelling in his leg to be evaluated by Dr. Ashby and for a mental health visit. Mr. Becton came to ACDF with some medications, but Nurse Teferi did not continue him on those medications at that time because he could not verify where he obtained these medications. (Teferi depo, pp 47-48, 60-61).

The medical record reflects that there were 23 nursing encounters with Mr. Becton over the next two days. (SA 000001-000251).

On September 30, 2020, Mr. Becton failed to appear for two medical calls – at 6:03 a.m. with LPN Cooper, (SA 000032-000033) and at 22:44 with LPN Levister (SA 000227). There were no reported complaints from Mr. Becton.

On October 1, 2020, around 4:33 am, LPN Levister checked on Mr. Becton. (SA 000225-000226). At that time, she obtained a high blood pressure reading of 191/102. (SA 000225-000226). LPN Levister consulted with RN Ntiamoah, who was the charge nurse in the infirmary that morning. Nurse Ntiamoah instructed the deputies to bring Mr. Becton down to the infirmary where she performed an assessment and immediately began treating him. (Ntiamoah depo., p. 25, 28, 77, 150). He was throwing up. He had withdrawal symptoms. (Ntiamoah depo, p. 57, 119). He specifically told Nurse Ntiamoah that he used heroin and fentanyl. (Ntiamoah

depo. 111). Nurse Ntiamoah cared for Mr. Becton throughout the early morning hours. (Ntiamoah depo., p. 76). Thereafter, she checked on him periodically to make sure he was ok and "kept an eye on him." (Ntiamoah depo, p. 47).

The entire interaction is captured on video, which was produced. The videotape also shows that Mr. Becton was able to walk unsupported (he got himself a towel.) The below photograph is a still shot from the videotape showing Nurse Ntiamoah taking Mr. Becton's blood pressure and apparently checking his pulse:



The above photograph is a still of a video of Nurse Ntiamoah caring for Mr. Becton in the Arlington Detention Center infirmary at 4:50 am on October 1, 2020 (the day he died).

Per the withdrawal protocol ordered by Dr. Ashby (the medical director), Nurse Ntiamoah administered five mediations to Mr. Becton: Ativan (for anxiety), Tylenol (for pain and discomfort), Pepto Bismol (for gastrointestinal upset), Phenergan (for vomiting) and Clonidine

(for withdrawal symptoms and lowers blood pressure). (Ntiamoah depo., p. 168). Thereafter, she called Dr. Ashby at his home at around 4:30 am to advise him that Mr. Becton was exhibiting symptoms of opiate withdrawal. (Ntiamoah depo. pp. 29-30, 32). Dr. Ashby told her what to do and he instructed her to admit him to the infirmary. (Ntiamoah depo., p. 30-31, 146).

Thereafter, Nurse Ntiamoah took Mr. Becton's blood pressure again at 5:23 a.m. and his blood pressure had reduced to 183/90. (SA 000224). Thus, it appeared that he was responding to the medication. (Ntiamoah depo., p. 28).

Nurse Ntiamoah was scheduled to be off work at 7:00 am. Just before her shift ended, she rechecked on Mr. Becton in his cell and again took his blood pressure. (Ntiamoah depo, page 45, 147). At that time, his blood pressure had further reduced to 151/76 (SA 000222). He was no longer throwing up. (Ntiamoah depo. page 43, 176). Thus, it appeared that he was responding to the medication. Nurse Ntiamoah testified that he was calm, in no apparent distress, resting easy and she thinks she gave him breakfast. (Ntiamoah depo. p. 155, 175). Nurse Ntiamoah spoke to him before she left and he was ok. (Ntiamoah depo., page 26.) She took care of him totally and he was alive when she left. (Ntiamoah depo. p 200). It surprised her when she learned later that night that he had died. Ntiamoah depo., p. 26).

The next shift came on. At 7:38 a.m. LPN Smith checked on Mr. Becton looking in on his cell and he wrote a note "Pt. observed asleep in his bed at this time. Movement noted, no acute distress noted. Will continue to observe." (SA 000041-000042). Several of the medications that he had taken caused drowsiness (Deposition of Dr. Milzman, not yet transcribed).

Only deputies can open the infirmary cell doors. (Antoine Smith depo, page 24). Antoine Smith was called upstairs that day for two emergencies and he had other duties for sick call, diabetics and medical treatment next door. (Antoine Smith depo. p 12, 15, 16). All of Mr. Becton's

medicines were PRN, as needed. (Antoine Smith depo. page 61).

At 9:40 a.m., RN Toy looked in on Mr. Becton and wrote a note that the patient was present in the infirmary with hyperemesis (vomiting) due to substance abuse withdrawal. (SA 000039-0000040). Nurse Toy clarified at deposition that Mr. Becton was not throwing up strongly.

There was a call button in infirmary cell. (Sok depo., p 114). Mr. Becton's cell was right next to the nurse's station. (Sok depo., p 143). There is no evidence that he ever solicited help from either the deputies nor the nurses for further help at any time, which is something that inmates could do. (Sok depo., pp 143- 144). He never told Deputy Sok that he felt lousy when Deputy Sok went in to help clean up throw up around 10:30 am and spoke to him. Nor did he say he felt lousy and needed help when Deputy Sok took his lunch to his cell around 12 pm. (Sok depo., 126-130). He grunted.

Dr. Ashby was not at ACDF when Mr. Becton was incarcerated. Dr. Ashby arrived on October 1 to the infirmary at about 11 am. (Dr. Ashby depo., p 113). He testified that he planned to see Mr. Becton later that day that he died. (Dr. Ashby depo., p 82).

The deputies checked on the infirmary inmates by rounding every 30 minutes. (Santilena depo. p 20). The videotape from that morning shows that Deputy Sok walked by and checked on Mr. Becton by looking in the window of his cell more than six times that morning. LPN Smith testified that they rely on the deputies and the inmates to let them know when they have trouble. (ANTOINE?? Smith depo. p 139). Even Sheriff Arthur stated that an inmate banging on the glass could be heard in the nursing station. (Arthur depo. pp 129-130).

Nurse Smith was the infirmary nurse, but he testified that there were other duties that he had to perform and two emergencies that day that took him out of the infirmary. (Antoine Smith depo. p 15, 49).

Deputy Laureano testified that he looked in on Mr. Becton around 2:30 pm and mentioned spilled Gatorade to the receptionist. He looked in on him again at 3:00 pm where he saw Mr. Becton's chest rising and falling. (Laureano depo, page 9-10, 28-30).

Mr. Becton was found by a social worker unresponsive about 4:28 pm. All of the nurses and Dr. Ashby reacted and undertook lifesaving measures. Six minutes later the EMT arrived and pronounced Mr. Becton dead. The medical examiner performed an autopsy and opined that the cause of death was cardiovascular disease complicated by opiate withdrawal. (BEC 000001-000004).

## II. Standard of Review

Summary judgment should be entered where there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). This standard is met when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The evidence, when viewed in the light most favorable to the non-moving party, must be enough for a reasonable jury to find in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Additionally, there is an affirmative obligation on the trial judge to prevent factually unsupported claims from proceeding to trial. *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003).

III. **There is No *Prima Facie* Showing of Deliberate Indifference**

To establish a violation of Mr. Becton's civil rights, plaintiffs must demonstrate that the Defendants were deliberately indifferent to his serious medical needs. *Brown v. Harris,* 240 F.3d

383, 388 (4th Cir. 2001). Generally, deliberate indifference requires that a defendant consciously disregarded the substantial risk of an inmate's serious medical need. *Young v. City of Mount Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001):

> [O]fficials can be liable under the deliberate indifference standard only to the extent that they actually appreciate the risk factors in a given case, and only to the extent they make the causal inference that the circumstances as they perceived them created a substantial risk of serious harm. Holding officials accountable for risk factors that they did not actually recognize, while permissible if negligence were the standard of culpability, is not permissible when deliberate indifference is the standard.

*Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 304 (4th Cir. 2004).

An official must both "know of" and "disregard" the risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It is not enough that the officers should have recognized [the risk of harm]; they actually must have perceived the risk. *Parrish*, 372 F.3d at 303, or recognized that his actions were insufficient. *Id.*; *see Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment actionable under § 1983. *Farmer*, 511 U.S. at 838.

In *Shaver v. Brimfield Twnshp*, 2014 U.S. Dist. Ct. Lexis 180571 (N.D. Ohio 2014), the court entered summary judgment in a case concluding that a failure to follow a withdrawal policy in all respects is not deliberate indifference. The Virginia case of *Thornhill v. Aylor*, 2017 U.S. Dist. Lexis 172076 (W.D. Va. 2017) is factually distinguishable. In that case, the jail had no medical staff from 11:00 pm to 5:30 am. In the present case, Nurse Ntiamoah was actively caring for Mr. Becton at 5 am and called the doctor and got instructions. In that case, the inmate complained of difficulty breathing, he fell in the shower and he was vomiting blood. Here, by contrast, Mr. Becton never complained and he was given medication that causes drowsiness.

Nurse Ntiamoah followed the doctor's protocol and instructions and there is no basis to hold her liable. *Cf. Padula v. Trumbull Cty*, 2012 U.S. Dist. Lexis 111629, 2012 WL 326023 (N.D. Ohio 2012) (where nurses contact physicians and follow instructions, courts are reticent to hold medical staff liable).

In this case, none of the Corizon nurses appreciated that plaintiff's heart condition posed a risk to him while he was undergoing withdrawal. They were confronted with clear signs of opiate withdrawal, which they had encountered before. Nurse Toy testified that she was aware that Mr. Becton had been in jail a few times and had issues with drugs, but she had no knowledge of his heart condition. (Toy Depo, p. 157). Similarly, Nurse Smith testified that he knew that Mr. Becton had high blood pressure but he did not know that he had a heart condition. (Smith Depo, p. 135). Nurse Ntiamoah was shocked that he died and testified that he never told her he had blood pressure issues. She was concentrating on treating his withdrawing symptoms. (Ntiamoah depo. 56-57). She could not say that high blood pressure and headaches was a warning sign for stroke because he had many symptoms. (Ntiamoah depo., p 133).

Dr. Ashby stated that withdrawal was a common scenario at the jail. (Dr. Ashby depo. p 31). He stated that he did not see anything about heart disease in Mr. Becton's record. (Dr. Ashby depo. p 54). He did not make any connection for the fact that he had headaches and high blood pressure. (Dr. Ashby depo. p 103). It was totally unpredictable that Mr. Becton's heart would succumb in this fashion after being appropriately medicated for withdrawal symptoms and resting.

The fact that hypertension was noted in his record does not amount to knowledge that a more profound event would occur and his heart would just stop. Nurse Ntiamoah was treating the withdrawal that confronted her. She did not look back in his chart to know he had hypertension, and did not know he had it. Most inmates do have hypertension. (Ntiamoah depo p 54, 170). She

was not treating hypertension, she was treating symptoms of withdrawal. (Ntiamoah depo 192). If she had reviewed his records, she would not have done anything differently. (Ntiamoah depo p 181).

The uncontroverted evidence is that defendants undertook specific affirmative steps to care for Mr. Becton during this two-day time period. He was placed on a protocol or watch for withdrawal symptoms, when symptoms began he was brought to the Infirmary and given five medications to him per (COWS) protocol designed to address withdrawal. He was checked on thereafter. Nurse Ntiamoah called the physician, and she checked his blood pressure again before she left for the day. This is not evidence of deliberate indifference nor is it evidence of egregious conduct. This is affirmative evidence of due care. Accordingly, summary judgment is warranted on the Section 1983 claim against defendants.

Dr. Ashby never saw Mr. Becton, but he reviewed chart entries twice. Nurse Toy only made one chart entry. She was not the infirmary nurse. LPN Smith checked on Mr. Becton, but he did not do so again as he had other duties. He was sleeping. No deputies alerted him of any problem, nor did Mr. Becton.

IV. **There is No *Prima Facie* Showing of Gross Negligence Under Count II**

In Virginia, punitive damages awards are disfavored, awardable only in cases involving the most egregious conduct. *Bowers v. Westvaco Corp.*, 244 Va. 139, 150 (1992). "Gross negligence" is a degree of negligence showing indifference to another and an utter disregard or prudence that amounts to complete disregard of the safety of such other person. *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487, 603 S.E.2d 916, 918 (2004). Gross negligence amounts to the absence of slight diligence, or of even scant care. *Chapman v. City of Virginia Beach,* 252 Va. 186 (996). If reasonable minds could not differ, it is an issue for the court. *Frasier v. City of*

*Norfolk,* 234 Va. 388, 393 (1987). The Virginia Supreme Court stated that a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care. *Elliott v. Carter*, 292 Va. 618 (2016); *Kuykendall v. Young Life*, 261 Fed. Appx. 480, 491 (4th Cir. 2008).

Clearly there was evidence of care of Mr. Becton. Summary judgment is warranted on Count II.

V. **There is No *Prima Facie* Showing of Willful and Wanton Negligence Under Count III**

Willful and wanton negligence must be pled with factual support that the Defendants' conduct was at least recklessly indifferent and amounted to egregious conduct. *Woods v. Mendez,* 265 Va. 68, 76-77 (2003). The terms "willful and wanton conduct" important knowledge and consciousness that injury will result from the act done. *Wallen v. Allen,* 231 Va. 289, 297 (1986). The Virginia Supreme Court has recognized a very factual standard to plead willful and wanton conduct. To define willful and wanton conduct, a person must be some type of egregious conduct – conduct going beyond that which shocks fair-minded people. *Harris v. Harman,* 253 Va. 336, 341 (1997).

In the present case, there is no conduct by Defendants that shocks the conscious warranting an award of punitive damages for willful and wanton conduct. On the contrary, Corizon and its nurses and its physician undertook affirmative steps to care for Mr. Becton who died of an unpredictable heart failure. There is no basis for punitive damages based on willful and wanton conduct and Summary Judgment should be entered in favor of Count IV.

VI. **Plaintiff's Malpractice Claims Fail Because Their Experts Lack Current Clinical Experience**

In Virginia, "a plaintiff who seeks to establish actionable negligence must plead the

existence of a legal duty, violation of that duty, and proximate causation which results in injury." *Kellermann v. McDonough,* 278 Va. 478, 684 S.E.2d 786, 790 (2009). Virginia courts have held that, in medical malpractice cases, "expert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages." *Raines v. Lutz*, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986); *Johnson v. Quinones*, 145 F.3d 164,166-67 (4th Cir. 1999). In order to qualify as an expert, the witness must show familiarity with the 'degree of skill and care' employed by the ordinary, prudent practitioner in the relevant field and community." *Fitzgerald v. Manning*, 679 F.2d 341, 347 (4th Cir. 1982). This requirement has been strictly applied in Virginia. *Id*.

> Virginia Code §8.01-581.20 applies and it provides:
>
> A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

The Supreme Court of Virginia addressed the "same or related field of medicine" requirement outlined in Va. Code §8.01-581.20 and held that a neurosurgeon could not render expert testimony against an orthopedic surgeon in a case involving a particular procedure. *Lawson v. Elkins*, 252 Va. 352, 354-355, 477 S.E.2d 510, 511-12 (1996). It further found that a certificate for participating in a seminar about the procedure was insufficient to qualify the witness as an expert in that subject. *Id*., 477 S.E.2d at 511-12.

Dr. Milzman testified that he has been an emergency room physician for over 25 years. He only worked as an interim director in the DC jail for one year. He is not a nurse. Under the above standards, he is not qualified to opine on whether or not the correctional nurses or Dr. Ashby met

the applicable standard of care. Similarly, Dr. Auerbach is a family practitioner with no correctional experience. Nurse Roscoe is a nurse practitioner, not a practicing RN nor an LPN. Additionally, her CV reflects that she does not have clinical experience within one year of October 1, 2020. Accordingly, summary judgment is warranted on Count I.

Respectfully submitted,

                **CORIZON HEALTH, INC., RICHARD ASHBY, MD, LOIS NTIAMOAH, RN, AND NATASHA TOY, RN**
                Defendants, By Counsel:

                /s/ *Anthony D. Dwyer*
                Anthony D. Dwyer
                Virginia State Bar No. 38342
                ECCLESTON & WOLF, P.C.
                10400 Eaton Place, Suite 107
                Fairfax, Virginia 22030
                703.218.5330 (telephone)
                703.218.5350 (facsimile)
                dwyer@ewva.com
                *Counsel for Defendants, Corizon Health, Inc.; Richard Ashby, MD, Lois Ntiamoah, RN, Natasha Toy, RN*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November 2022, I served a copy of the foregoing Memorandum of Points and Authorities in Support of Motion for Summary Judgment upon the following via ECF:

| | |
|---|---|
| Mark J. Krudys, VSB #30718<br>Danny Zemel, VSB #95073<br>The Krudys Law Firm, P.C.<br>Truist Place<br>919 E. Main Street, Suite 2020<br>Richmond, VA 23219<br>mkrudys@krudys.com<br>*Counsel for Plaintiff* | Alexander Francuzenko, VSB #36510<br>Philip C. Krone, VSB #87723<br>John David Coker, VSB #92883<br>Cook Craig & Francuzenko, PLLC<br>3050 Chain Bridge Road, Suite 200<br>Fairfax, VA 22030<br>alex@cookcraig.com<br>pkrone@cookcraig.com<br>jdcoker@cookcraig.com<br>*Counsel for Sheriff Elizabeth ("Beth") Arthur and Deputy Seaton Sok* |
| Coreen Silverman, Esq.<br>Michael Essig, Esq.<br>Hancock Daniel<br>4701 Cox Road, Suite 400<br>Glen Allen, VA 23060<br>csilverman@hancockdaniel.com<br>messig@hancockdaniel.com<br>*Counsel for Antoine Smith, LPN* | |

                                                *Anthony D. Dwyer*
                                                Anthony D. Dwyer
                                                Virginia State Bar No. 38342