MONIQUE SHENELL FORD,
ADMINISTRATOR OF THE ESTATE OF
DARRYL TERRELL BECTON, DECEASED,

       Plaintiff,

v.                                  Case No.: 1:22-cv-00411

CORIZON HEALTH, INC., *et al.*,

       Defendants.

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS CORIZON HEALTH, INC., RICHARD ASHBY, MD, LOIS NTIAMOAH, RN, <u>AND NATASHA TOY, RN'S MOTION FOR SUMMARY JUDGMENT</u>

    Plaintiff Monique Shenell Ford, Administrator of the Estate of Darryl Terrell Becton, Deceased, by counsel, herein provides her Memorandum in Opposition to the Motion for Summary Judgment (ECF 45) filed by Defendants Corizon Health, Inc., Richard Ashby, MD, Lois Ntiamoah, RN, and Natasha Toy, RN.

### Introduction

    Darryl Becton spent the last nine hours of his life in a cell, in the infirmary, mere feet away from the medical staff that were supposed to care for him. None of them checked on him. It was a Department of Human Services employee who eventually sounded the alarm about Mr. Becton's condition. By then it was too late. Now, based largely on statements from their own depositions, three of those medical professionals who ignored Mr. Becton seek summary judgment. There is sufficient evidence in the record for the jury to find that Defendants Ashby and Toy acted callously towards Mr. Becton, and their attempts to remove themselves from this

case should be denied.  There further is sufficient evidence for a jury to find that Defendant

Ntiamoah acted negligently, and that count should also be permitted to proceed.[1]

## Statement of Relevant Facts from the Record

Mr. Becton was admitted to the Arlington County Detention Facility (the "Jail") on

September 29, 2020. ECF 49-2, at 16.  During his intake, Mr. Becton disclosed his recent use of

opiates, his withdrawal history, and his history of hypertension and cardiac complications. *Id*. at

16-18.  While conducting Mr. Becton's intake assessment, Corizon employee Nurse Teferi

Fikre-Miriam again noted his long history of hypertension, as well as a "bilateral lower extremity

edema +3" (acute swelling in both legs). Exhibit A (Excerpts from Medical Records), at 7.  She

also recorded a set of vital signs, which included, among others: a pulse of 63, a respitory rate of

16, and a blood pressure of 127/79. *Id*.  His blood pressure was within normal limits when he

entered the Jail.

Despite Mr. Becton's disclosure of opiate use, Nurse Fikre-Miriam placed him on the

protocol for alcohol withdrawal assessment ("CIWA"), not the one for opiates ("COWS").[2]

Exhibit A (Excerpts from Medical Records), at 7.  Nurse Fikre-Miriam also noted that Mr.

Becton was on numerous medications but those were not continued, despite Dr. Ashby being the

prescribing provider for the medications. *Id*. at 5.  Nurse Fikre-Miriam also noted that Mr.

Becton was scheduled for an "Expedited practitioner sick call" on 9/30/2020, but that

appointment never happened. *Id*. at 7.  It may not have happened because according to Dr.

Ashby, the medical director at the Jail, there is no such thing an expedited sick call, "that is just a

---

[1] Plaintiff is not contesting Defendant Ntiamoah's portion of the motion relating to the deliberate indifference, willful and wanton negligence, and gross negligence claims against her.

[2] The Clinical Opiate Withdrawal Scale (COWS) is a way of determining the severity of withdrawal symptoms as measured over time. The form is a standardized one, *available at* https://nida.nih.gov/sites/default/files/ClinicalOpiateWithdrawalScale.pdf.

formality that nurses may make." Exhibit B (Deposition of Defendant Ashby), at 82.  Dr. Ashby reviewed Mr. Becton's medical records on September 30, 2020 but did not go see Mr. Becton or ask any questions about him. *Id*. at 55.

On September 30, 2020, at around 11:00 a.m., two staff members from the Department of Human Services came to see Mr. Becton as part of a mental health referral based on statements he had made at his intake about feeling helpless. Exhibit C (Arlington County Sheriff's Office ("ACSO") Investigation Report), at 6.  Mr. Becton told them he did not want to answer any questions because he was not feeling well and was withdrawing from heroin. *Id*.  One of the DHS staff members reported this to Deputy Boroff, who was stationed on Mr. Becton's unit and told him to call medical for Mr. Becton. *Id*.  Deputy Boroff did call medical and told them that Mr. Becton needed to see a nurse. *Id*. at 10.  He also noted that Mr. Becton did not eat lunch that day. *Id*.  Deputy Boroff did not see any medical staff come to check on Mr. Becton during his shift.

That evening, Mr. Becton again did not want to leave his cell for evening recreation because he was going through withdrawals and did not feel well. *Id*. at 8.  In the early morning hours of October 1, 2020, Deputy Perry saw Mr. Becton vomiting in his cell. *Id*.  Mr. Becton told Deputy Perry he wanted to see a nurse and the deputy asked if he could wait fifteen minutes for the triage nurse to arrive, which Mr. Becton agreed to do. *Id*.  That nurse, Corizon-employee Nurse Levister, arrived and took Mr. Becton's blood pressure and pulse.  The readings were a sky high 191/102 and an abnormally low 52, respectively. ECF 49-2, at 4.  Deputy Perry observed that during this time Mr. Becton was "bent over and appeared to be gasping for air." Exhibit C (ACSO Investigation Report), at 8.  Nurse Levister said she would call the doctor and left the unit. *Id*.  There is nothing in the record to suggest that she did anything of the sort.

Twenty minutes went by, and Mr. Becton again told Deputy Perry that he needed to see a nurse. The deputy called down to medical and again told Nurse Levister that Mr. Becton needed assistance. *Id*. Another fifteen minutes goes by and finally Deputy Perry receives a call telling him to send Mr. Becton down to medical. *Id*. In all, it would take over an hour between the time that Nurse Levister took Mr. Becton's vitals and Mr. Becton being escorted down to medical. *Id*. at 17. While searching Mr. Becton's cell after he left for medical, Deputy Perry found vomit in the toilet. *Id*.

Once in Medical, at 4:51 a.m., Mr. Becton had his vitals taken again by Nurse Ntiamoah. His blood pressure was still very high at 183/90 and his pulse fell even more to 49 (a pulse below 60 is abnormal; the condition is referred to as "bradycardia"). *Id*. She also noted that he had body aches on a scale of 9 out of 10 and his GI system was upset. Exhibit A (Excerpts from Medical Records), at 4. The COWS score is listed as a 5, *id*., but this is clearly an error. According to the standardized COWS form, *see supra,* fn. 2, Mr. Becton's vomiting is a 5 on its own. Combined with his body aches (another 2 or 4), yawning (another 2 or 4), and fact that he was cold (another 1), Mr. Becton's score was at least above 13, putting him into moderate symptoms range.

Video footage shows that Mr. Becton continued to vomit during this time. Exhibit C (ACSO Investigation Report), at 17. Nurse Ntiamoah started the typical withdrawal medication protocol (Pepto Bismal, low-dose Clonidine, Tylenol, Lorazepam, and Promethazine), and finally contacted Dr. Ashby to tell him about Mr. Becton's condition. Exhibit B (Deposition of Defendant Ashby), at 98-99. Dr. Ashby just told her to continue monitoring Mr. Becton, he did not come in to see Mr. Becton or have him sent out to a hospital immediately despite his high blood pressure and low pulse.

Mr. Becton was then placed in Cell 7 in the infirmary (the bank of cells in the medical unit) where he would die later that day. At around 6:15 a.m. Mr. Becton refused his breakfast. Exhibit C (ACSO Investigation Report), at 17. At 6:56 a.m., the last set of vitals were taken. Nurse Ntiamoah recorded the numbers as a pulse of 68 and blood pressure of 151/76. *Id*. at 18. Another set of vital signs would not be recorded over the next **nine hours** before Mr. Becton was found deceased. Despite Mr. Becton being on the opiate withdrawal protocol and being in the infirmary in medical, he was ignored by the Corizon medical staff and Jail staff on duty that day.

Nurse Ntiamoah left the Jail at 7:00 a.m. that morning, October 1, 2020, and was replaced by Nurses Natasha Toy and Antoine Smith, among others. During the turnover, Nurse Ntiamoah informed them of Mr. Becton's condition. *Id*. at 9. Nurse Toy walked by Mr. Becton's cell shortly after arriving and noted that Mr. Becton was vomiting, but shockingly took no further action. *Id*. at 18. Nurse Toy did not report this interaction until that afternoon, at which time she stated that she saw him throwing up at 9:40 a.m. *Id*. However, video footage shows that she only observed Mr. Becton's cell at 7:24 a.m. and 7:48 a.m. on October 1, 2020.

Nurse Smith arrived at work around the same time as Nurse Toy. He reported in Mr. Becton's records that as of 7:35 a.m., Mr. Becton was asleep, not moving, and not in distress. *Id*. Considering Nurse Toy saw Mr. Becton vomiting at around the same time, the accuracy of Nurse Smith's entry is very much in doubt. More importantly, Nurse Smith also wrote that he would continue to observe Mr. Becton. *Id*. That did not happen.

Dr. Ashby arrived at the Jail at around 11:00 a.m. that day. Exhibit B (Deposition of Defendant Ashby), at 146. Dr. Ashby said that he normally sees the patients in the Infirmary cells when he first comes into the Jail, but he opted not to do so that day. *Id*. at 113. He would

spend his day in the medical unit a mere feet away from Mr. Becton, whom he had been called about early that morning, but he never even laid eyes on Mr. Becton.

At approximately 10:30 that morning, Deputy Sok (who was working in the medical unit that day) was told by an administrative assistant who works for Corizon that Mr. Becton had vomited. Exhibit C (ACSO Investigation Report), at 3. At lunchtime, Deputy Sok went to deliver lunch to Mr. Becton, who merely grunted at him. *Id*. Throughout his entire shift, Deputy Sok never saw Mr. Becton get up from the plastic bed on the floor where he lay. Exhibit D (Deposition of Defendant Sok), at 105.

Nurses Toy and Smith, both working on October 1, 2020 starting at approximately 7:00 a.m., never took Mr. Becton's vital signs. They did not complete the COWS protocol. They did not even have a conversation with Mr. Becton. Despite being mere feet from him, both Nurses, and Dr. Ashby, left him to die. It would take a member of DHS to finally discover Mr. Becton's condition. At 4:15 p.m., hours and hours after Mr. Becton last received medical attention, a therapist named Joe Burgus went to speak to Mr. Becton. Exhibit C (ACSO Investigation Report), at 20. That therapist could not get Mr. Becton's attention despite banging on the door and called for help. Mr. Becton would be pronounced dead soon thereafter. The Office of the Chief Medical Examiner listed his cause of death as "Hypertensive Cardiovascular Disease Complicated by Opiate Withdrawal." ECF 49-11, at 2.

Video footage of the infirmary area shows no contact between Corizon staff and Mr. Becton after 6:56 a.m. on October 1, 2020 – a span of more than 9 hours preceding Mr. Becton being found unresponsive. Exhibit C (ACSO Investigation Report), at 18-20.

**Response to Defendant's Statement of Undisputed Facts**

¶ 1.     Not disputed, but irrelevant.

¶ 2.     Not disputed, but irrelevant.  Mr. Becton's alleged crimes have no relation to the medical care he did not receive at the Jail.

¶ 3.     Disputed that Nurse Teferi put Mr. Becton on the COWS protocol, he actually put Mr. Becton on an alcohol withdrawal program. Exhibit A (Excerpts from Medical Records), at 5-7.  The rest is not disputed, but incomplete.  According to Dr. Ashby, there is no such thing as expedited sick call. Exhibit B (Deposition of Defendant Ashby), at 82.  Moreover, the medications that could not be verified had been ordered by Dr. Ashby the last time Mr. Becton was incarcerated at the Jail. ECF 49-2, at 16.

¶ 4.     The Plaintiff is unable to respond to the assertion as the Defendants fail to articulate each encounter.[3]  Also, there is evidence suggesting some of those encounters did not actually occur as discussed throughout this Memorandum.

¶ 5.     Disputed that Mr. Becton "failed to appear" twice. While Defendants only attached documents demonstrating the second alleged refusal, Plaintiff does not dispute that the records reflect such.  However, neither alleged failure contained the inmate refusal or signed witness forms mandated by the applicable policies. ECF 49-2; Exhibit B (Deposition of Defendant Ashby), at 107-108.  Nor does the video footage reviewed by the Arlington County Sheriff's Office show either LPN Cooper or LPN Levister going to Mr. Becton's cells at that time to obtain a refusal. Exhibit C (ACSO Investigation Report), at 16-17. Moreover, at the same time Mr. Becton is supposedly refusing medical assistance for a second time, he is telling Deputy Perry that he cannot come out for evening recreation because he does not feel well and is going through withdrawals. *Id.* at 8.  Disputed that Mr. Becton made no complaints on September 30, 2020.  Ashly Adkins of the Department of Human Services reported in her interview that Mr.

---

[3] The records cited in this paragraph were not attached as exhibits.

Becton told her on September 30, 2020 "that he was not feeling well." *Id*. at 6.  Deputy Boroff also stated that he called down to medical to tell them that Mr. Becton was not feeling well on September 30. *Id*. at 10.

¶ 6.     Not disputed, but incomplete.  Nurse Levister checked on Mr. Becton because deputies, including Deputies Perry and Boroff, had called down to Medical seeking assistance for Mr. Becton. *Id*. at 7-10; Exhibit E (Rule 30(b)(6) Deposition of Corizon Representative Karen Davies), at 93.  Moreover, the description of Mr. Becton's symptoms is incomplete. According to Defendant Ntiamoah, Mr. Becton was vomiting so much that "he can't even speak straight sentences to me." Exhibit F (Deposition of Defendant Ntiamoah), at 57.  In fact, Defendant Ntiamoah originally stated that Mr. Becton "was not in distress" despite his vomiting. She clarified that to her, Mr. Becton would not be in distress unless "like he's about to die or anything like that." *Id*. at 27-28.  Lastly, the Defendants fail to note that not only was Mr. Becton's blood pressure 191/102, but his pulse was also dangerously low (bradycardic), at 52. ECF 49-2, at 4.

¶ 7.  Not disputed.

¶ 8.  Not disputed as to the blood pressure reading, but incomplete.  Mr. Becton's pulse had actually gone down during this time, from 52 to 49 beats per minute. ECF 49-2, at 4.  That is a dangerously low reading, especially when combined with Mr. Becton's high blood pressure. Disputed as to when this reading was done, a review of video footage showed Defendant Ntiamoah taking this reading at 4:51 a.m., not at 5:23 a.m. Exhibit C (ACSO Investigation Report), at 17.  This is important; it means the second reading was done *before* any medication was administered, meaning Mr. Becton could not be "responding to the medication."

¶ 9.  Not disputed that Defendant Ntiamoah left at 7:00 a.m., that she took his blood pressure (and pulse), and that the blood pressure reading was 151/76.

Disputed that Mr. Becton was no longer throwing up. Nurse Toy saw him doing so less than an hour later, though she waited another two hours to record it. *Id*. at 18.

Disputed that Defendant Ntiamoah gave Mr. Becton breakfast on October 1, 2020. Deputy Santilena stated that Mr. Becton told her he did not want breakfast that morning because he did not feel like eating. *Id*. at 7.

Not disputed that Defendant Ntiamoah testified that Mr. Becton was "ok" but disputed that he actually was as evidenced by his continued vomiting. *Id*. at 18.

Disputed that Defendant Ntiamoah "took care" of Mr. Becton, he died hours later and when she left him, he still had an elevated blood pressure and his low pulse had not been addressed. *Id*.

¶ 10.    Not disputed that Defendant Smith made such a notation, but disputed that it is accurate. *See id*.  Further, it is not disputed that some of the medications Mr. Becton had been prescribed cause drowsiness, but there is no evidence in the record that Defendant Smith was aware of that at the time.  It is therefore irrelevant to Defendant Smith's observations of Mr. Becton.

¶ 11.    It is not disputed that only deputies can open infirmary cell doors, but irrelevant; to see a patient in the infirmary, all that Defendant Smith need to have done was to ask for a deputy, which he did not do.

Further, it is not disputed that Defendant Smith claims that is what he was doing, but no records were produced to corroborate that.  More importantly, what Defendant Smith was doing

instead of caring for Mr. Becton is irrelevant. What is relevant is that he was not caring for Mr. Becton.

Not disputed that Mr. Becton's medications were PRN. However, as discussed, there is evidence that Mr. Becton was not ambulatory and could not request the medication. Exhibit D (Deposition of Defendant Sok), at 105.

¶ 12.  Not disputed as to the medical notations, but incomplete. Defendant Toy also wrote: "Patient observed through cell window vomiting into the biohazardous bag." Exhibit C (ACSO Investigation Report), at 18. Not disputed that Defendant Toy attempted to walk her statement about hyperemesis back at her deposition. Exhibit G (Deposition of Defendant Toy), at page 118-19. However, when first read that entry during her deposition and asked if she observed what she wrote in that entry, Nurse Toy answered, "Yes." *Id*. at 58. The jury can determine which version of Nurse Toy's story is the actual one.

¶ 13.  Not disputed, but very incomplete. As Deputy Sok also testified, he never saw Mr. Becton leave the floor where his bed was after Deputy Sok came on duty around 7 a.m. on October 1, 2020. Exhibit D (Deposition of Defendant Sok), at 105. There is no evidence that Mr. Becton could reach the call button as his condition worsened. Moreover, Mr. Becton's grunt as lunchtime can be read as an indication of his inability to speak by then.

¶ 14.  Not disputed; Defendants' assertion the Dr. Ashby planned to see Mr. Becton later that day only underscores his awareness of Mr. Becton and his acute condition.

¶ 15.  Not disputed that Deputy Santilena testified that rounding should occur every 30 minutes, but disputed that the rounding did occur. Exhibit C (ACSO Investigation Report), at 14-19. The second sentence is not disputed, but it is incomplete. Deputy Sok also noted visual rounds that the camera shows he did not complete. *Id*. at 11-12. The third sentence is not

disputed, but betrays a failure by Defendant Smith, LPN to carry out his *own* duties. The fourth sentence is also not disputed, but is misleading and incomplete. Deputy Sok testified that throughout his entire shift on the last day of Mr. Becton's life, Mr. Becton never rose from his bed. Exhibit D (Deposition of Defendant Sok), at 105. That would make it quite hard to bang on the glass.

¶ 16.    Not disputed.

¶ 17.    Not disputed that Deputy Laureano testified to such, but disputed that his testimony was accurate. Based on the condition of Mr. Becton's body when he was found unresponsive at 4:15 p.m., barely an hour after Deputy Laureano reportedly checked on him (at 3:20pm, not 3:00pm), Mr. Becton was likely not alive at 3:20 p.m. Exhibit B (Deposition of Defendant Ashby), at 86-87.

¶ 18.    Not disputed.

**Argument**

## I.    Standard of Review

Summary judgment is appropriate only when the movant, citing to supporting materials in the record, shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) & (c). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party must set forth facts, citing to particular parts of the record (although the court may also consider other materials in the record (Fed. R. Civ. P. 56(c)(3)), sufficient to show that there are genuine issues for trial. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). At summary judgment, the court

"must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*, at 659 (internal citations and alterations omitted). Summary judgment is further not appropriate even if there is no dispute as to the evidentiary facts, but the parties dispute the ultimate factual *conclusions* to be drawn therefrom. *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991) (emphasis added).

Lastly, deliberate indifference and negligence claims are intensely fact specific, which militates against the granting of summary judgment. *See Haavistola v. Community Fire Co.*, 6 F.3d 211, 222 (4th Cir. 1993); *Rascher v. Friend*, 279 Va. 370, 376 (2010).

## II. Mr. Becton did not die from a sudden and profound heart failure, rather his acute withdrawal syndrome stressed his heart, resulting in acute heart failure.

The Corizon Defendants put a lot of emphasis on their assertion that they knew Mr. Becton was suffering from withdrawals, but did not know about his heart condition. *See* ECF 49, at 9-10. Plaintiff disagrees that these Defendants did not know about Mr. Becton's heart condition. But even assuming that is true, it misses the point. Mr. Becton's withdrawals and his heart condition are not separable. As Plaintiff's expert Dr. Fierro[4] explains in her report, Mr. Becton's case is "not a picture of primary cardiac death in a hypertensive person which is usually sudden and unexpected." Report at 5. Rather, the pathology here "favors a death due to acute withdrawal syndrome that resulted in a failing heart." *Id.* Essentially, Mr. Becton's severe withdrawal symptoms led to his heart failing; they were not separate events. Accordingly,

---

[4] Dr. Fierro served as the Chief Medical Examiner for the Commonwealth of Virginia for 15 years and is eminently qualified in forensic pathology. Exhibit H (Report and CV of Dr. Fierro), at 7.

Plaintiff needs to show the defendants in this matter exhibited deliberate indifference to Mr.

Becton's severe withdrawal, not that they were aware of his heart condition.[5]

### III. There is sufficient evidence in the record for a jury to find that Dr. Ashby and Nurse Toy acted with deliberate indifference and in a willfully and wantonly negligent way towards Darryl Becton's serious medical condition.

The Eighth Amendment's protection against cruel and unusual punishment is violated

when officials exhibit "deliberate indifference to serious medical needs of prisoners." *Farmer v.

Brennan*, 511 U.S. 825, 835 (1994) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).   A

claim based on deliberate indifference has both an objective and subjective component. *See

Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019).   To satisfy the objective prong, the plaintiff

must show that his decedent was denied one of life's minimal necessities, such as medical care.

*See Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).   In medical needs cases, the plaintiff

must demonstrate that his decedent suffered from a "serious" medical need. *Scinto v. Stansberry*,

841 F.3d 219, 225 (4th Cir. 2016).   Defendants do not seem to contest that Mr. Becton did not

have an objectively serious medical condition (nor could they), so Plaintiff will only address the

second prong.

The subjective prong requires a showing of deliberate indifference—that the defendants

knew of and disregarded an objectively serious medical condition. *Id.* (citing *Farmer v. Brennan*,

511 U.S. 825, 837 (1994)).   Crucially, despite the second prong being subjective, "a deliberately

indifferent state of mind can be proven through 'inference from circumstantial evidence.'"

*Thompson v. Commonwealth*, 878 F.3d 89, 108 (4th Cir. 2017) (quoting *Farmer*, 511 U.S. at

---

[5] As explained below though, Plaintiff can demonstrate that the Defendants were aware of the heart condition through circumstantial evidence as well.

842). That state of mind can also be demonstrated through the fact that the risk of ignoring the plaintiff's condition was obvious. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

Willful and wanton negligence is "action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Kaltman v. All American Pest Control, Inc.,* 281 Va. 483, 494 (2011) (quoting *Alfonso v. Robinson*, 257 Va. 540, 545 (1999)). The standard under Virginia law for willful and wanton negligence nearly mirrors that of the subjective prong under the *Farmer* deliberate indifference test. *Hixson v. Hutcheson*, 5:17-cv-00032, 2018 U.S. LEXIS 21962, at *22-23 (W.D. Va. Feb. 8, 2018) (comparing the two standards). Further, a demonstration of willful and wanton negligence is sufficient for the imposition of punitive damages under Virginia law. *See Green v. Ingram*, 269 Va. 281, 291-93 (2005).

A.    **Dr. Ashby.**

Dr. Ashby was scheduled to see Mr. Becton on September 30 for his "bilateral lower extremity edema +3," but never did. It is not clear *why* the scheduled examination did not occur, but the record is clear that it did not occur. This serious symptomology had to have complicated Mr. Becton's presentation when Dr. Ashby was called at approximately 4:30 a.m. on October 1 regarding Mr. Becton's severe symptoms of apparent opiate withdrawal. Any conversation of Mr. Becton's condition upon screening and thereafter would have flagged the edema and the failure of the Corizon staff to have addressed the condition, indeed, to have even examined Mr. Becton concerning the condition post initial screening.

Dr. Ashby knew as of around 5:00 a.m. on October 1 that Mr. Becton was in medical distress including significant hypertension, vomiting, and a headache, and was being transferred

to the infirmary. Exhibit B (Deposition of Defendant Ashby), at 98-104. Dr. Ashby then arrived at the infirmary at around 11:00 a.m. *Id*. at 113. Despite being feet away from his cell, Dr. Ashby never checked on Mr. Becton until Mr. Becton was found unconscious and declared dead. He did not evaluate Mr. Becton or ensure that Corizon staff were monitoring Mr. Becton. That failure caused Mr. Becton to die.

Dr. Ashby did not develop a plan to assess Mr. Becton, did not set up intravenous fluids for him, or go stick his head into Mr. Becton's cell. He never asked any of his staff about Mr. Becton's status or check that they were keeping up on Mr. Becton's vital signs. Dr. Ashby said he relied on his staff to bring things to his attention. *Id*. at 55. But when staff did notice things, such as the presence of edema, Dr. Ashby ignored that because, as he testified: "as a physician I question their ability to properly assess." *Id*. at 80. He also said that "knowing the level of clinical assessment that I have with my nurses, there are some aspects that I would question their judgment and documentation." *Id*. at 85. He even admitted to knowing that his staff had in the past not carried out the COWS protocol as they had been assigned to. *Id*. at 91. Despite believing (or knowing) his staff to be inadequate, Dr. Ashby failed to check on Mr. Becton himself. This failure, and the others noted, came despite Dr. Ashby knowing the severity of Mr. Becton's symptoms. *Id*. at 98-104.

Dr. Ashby admitted that it is unknown what Mr. Becton's vital signs and symptoms were for an entire nine hours before Mr. Becton's death. *Id*. at 148-49. Mr. Becton being in the infirmary did not help him receive care, he was left to die feet away from the medical professionals responsible for him. At this deposition, Dr. Ashby himself admitted that "Mr. Becton could be seen when I arrived there [the Jail]." *Id*. at 162. There is evidence in the record sufficient for a jury to find that Dr. Ashby "understood the risks inherent in [Mr. Becton's]

symptoms and prioritized ease to himself or the prison facilities in the face of serious risk to [Mr. Becton's] wellbeing." *Boley v. Armor Corr. Health Servs.*, 2022 U.S. Dist. LEXIS 56244, at *30 (E.D. Va. March 28, 2022).

Dr. Ashby's failings were numerous. Perhaps most importantly, "[t]here is no record that Dr. Ashby inquired about or was updated on Mr. Becton's status, COWS score, or vital signs after the morning briefing, despite Mr. Becton being located within feet of where Dr. Ashby was working." Exhibit I (Report of Dr. Auerbach), at 24. He ignored Mr. Becton's headache which, "in the setting of extremely high blood pressure, should have prompted a more thorough history and an immediate evaluation." *Id*. at 25.

Dr. Ashby's arguments to the contrary rely entirely on his statements from his deposition about his own supposed lack of knowledge or awareness of the situation. This ignorance, even if true, does not absolve Dr. Ashby of his liability in this matter. A "reasonable factfinder could determine that [Ashby's] avoidance of the very information that would have allowed [him] to appropriately recognize and treat [Mr. Becton]" constitutes deliberate indifference. *Thornhill v. Aylor*, No 3:15-cv-00024, 2017 U.S. Dist. LEXIS 172076, at *32-33 (W.D. Va. Oct. 18, 2017). Dr. Ashby's failed to adequately review Mr. Becton's records and, more importantly, never saw or assessed him. Dr. Ashby left Mr. Becton's care solely to LPNs and RNs. He relied on their representations, and lack of representations, and never performed his own evaluation on an acutely ill patient. He cannot now reap the benefits of his intentional ignorance.

As a member of the prison medical staff, Dr. Ashby had a duty to provide Mr. Becton "with constitutionally adequate treatment, not merely 'some treatment.'" *Boley v. Armor Corr. Health Servs.*, No. 2:21-cv-197, 2022 U.S. Dist. LEXIS 56244, at *25 (E.D. Va. March 28, 2022) (quoting *De'Lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013)). As the Fourth Circuit

explained in *De'Lonta*, while "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." 708 F.3d at 526. Dr. Ashby's treatment, such that it was, failed to adequately address Mr. Becton's serious medical need.

Moreover, to the extent Dr. Ashby is arguing that only knowledge of Mr. Becton's heart condition would provide proof of deliberate indifference, Dr. Ashby admits that on October 1 when he was reviewing Mr. Becton's records, he noted that Mr. Becton suffered from hypertension. Exhibit B (Deposition of Defendant Ashby), at 53. Dr. Ashby did not see any evidence of heart problems in the records because he only will look through the records "quickly to see if anything in particular jumps out." *Id*. at 54. Those records he was skimming included information showing Mr. Becton's risk of heart problems, including that Mr. Becton was taking aspirin to reduce a risk of heart attack and stroke and amlodipine for blood pressure. *Id*. at 66-68. In fact, the medication for hypertension that Mr. Becton was on had been prescribed by Dr. Ashby. ECF 49-2, at 16.

Dr. Ashby admitted during his deposition that Mr. Becton's symptoms could indicate encephalopathy, stroke, or a cardiovascular emergency. Exhibit B (Deposition of Defendant Ashby), at 165-68. He also provided a list of scenarios that would cause Mr. Becton to be sent to the hospital, which included: "unstable vital signs that could not be stabilized with intervention," "respiratory distress," or an "abnormal EKG." *Id*. at 141-42. Dr. Ashby would never know if Mr. Becton had any of these issues though, as his vitals were not checked again after 7:00 a.m. on October 1 and Dr. Ashby relied on a nursing staff he did not trust to examine Mr. Becton's heart and lungs. Once again, willful ignorance is not a defense to deliberate indifference. The subjective prong may be proven through circumstantial evidence. *See Makdessi v. Fields*, 789

F.3d 126, 129 (4th Cir. 2015) ("a defendant cannot "bury their heads in the sand and thereby skirt liability.").  Dr. Ashby knew Mr. Becton was undergoing severe opiate withdrawal and made no effort to aid Mr. Becton or ensure that his staff were caring for him.  That is deliberate indifference.

### B.    Nurse Toy.

When Defendant Toy came on duty around 7:00 a.m. on the morning of October 1, she learned from Defendant Ntiamoah that Mr. Becton had been throwing up repeatedly that morning and had an extremely high blood pressure. Exhibit F (Deposition of Defendant Ntiamoah), at 44.  Defendant Toy then went to look into Mr. Becton's cell, where she would have presumably seen the evidence of his vomiting.  Hours later, Defendant Toy finally noted in Mr. Becton's record what she had seen—that he has "hyperemesis" and was "observed through cell window vomiting into the biohazardous bag." Exhibit C (ACSO Investigation Report), at 18. Shockingly, Defendant Toy took no further action when she saw this or after documenting it. She did not even document the encounter in a timely manner, meaning any other clinician who looked at Mr. Becton's record would not know about what she saw. *Id*.  Defendant Toy did not even attempt to help Mr. Becton clean up; Defendant Deputy Sok would have to do that hours later. *Id*. at 19.

Perhaps even more shocking than her failure to assist Mr. Becton when she saw him vomiting, Defendant Toy took no action regarding Mr. Becton for her entire shift.  She would not see him again until she entered his cell with an Automated External Defibrillator after Mr. Becton had been found deceased.  For her entire shift, Defendant Toy never made any attempt to help Mr. Becton, contact her superiors, or call for emergency assistance.  This is all despite knowing how ill Mr. Becton was and that high blood pressure and headaches "could possibly be

a stroke" or a "heart attack." Exhibit G (Deposition of Defendant Toy), at 106. That is deliberate indifference.

**IV.**    **There is sufficient evidence in the record for a jury to find that Dr. Ashby and Nurse Toys' actions showed a total disregard for Darryl Becton's safety, establishing gross negligence.**

Gross negligence is "such a degree of negligence as would shock fair minded [people] although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 92 (1971). The distinction between "ordinary negligence and gross negligence is one of degree," not one of "kind." *Green v. Ingram*, 269 Va. 281, 292 (2005). Additionally, "[s]everal acts of negligence which separately may not amount to gross negligence, when combined may have a cumulative effect of showing a form of reckless or total disregard for another's safety." *Elliott v. Carter*, 292 Va. 618, 622 (2016) (quoting *Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996)).

**A.**    **Doctor Ashby and Nurse Toy.**

Even if Defendants Ashby and Toy are correct that they did not know the severity of Mr. Becton's condition and the harm that would come from him, they *should have known*, which is enough for gross negligence. *See Hixson v. Hutcheson*, 5:17-cv-00032, 2018 U.S. LEXIS 21962, at *19 (W.D. Va. Feb. 8, 2018) ("Unlike deliberate indifference, gross negligence does not require a finding that a defendant knew of a substantial risk. It is enough that the defendant should have been aware of the risk."). Here, Defendants Ashby and Toy at the very least should have been aware of the risk to Mr. Becton. Mr. Becton's electronic medical records painted a clear picture of his condition and how it had worsened since he entered the Jail. Multiple deputies working at the Jail knew that Mr. Boley was sick and needed help.

Defendants Ashby and Toy's argument to the contrary, brief as it is, *see* ECF 49, at 10-11, relies entirely on the phrase "some care." This argument revolves around accepting the assertion that *any* care, regardless of a connection or lack thereof to Mr. Becton's symptoms, would be enough to dismiss a claim for gross negligence. That is not the law. This argument ignores the role their knowledge of the risks to Mr. Becton plays in the analysis.

For example, in *Elliott v. Carter*, the "some degree of care" provided by the defendant, according to the Supreme Court of Virginia, was commensurate with the minimal risk a reasonably prudent person would have perceived. The *Elliott* court emphasized that "there is no allegation that [the defendant] was aware of any hidden danger posed by the sandbar, the river or its current." 292 Va. 618, 623 (2016). That lack of an obvious risk informed the amount of care the defendant needed to exhibit as a matter of law. Unlike the defendant in *Elliott*, the Corizon Defendants' medical education and training made them well aware of the risks to Mr. Becton and the potential for devasting consequences if Mr. Becton's symptoms were not properly addressed. Despite this knowledge, Defendants Ashby and Toy did not send Mr. Becton to a hospital, and Defendant Ashby did not even come to see Mr. Becton himself. Those choices demonstrate "a degree of negligence that would shock fair-minded persons." *Elliott,* 292 Va. at 622.

## B. LPN Levister.

The Supreme Court of Virginia has made clear that "a plaintiff pursuing relief against an employer on a theory of respondeat superior is not required to file an action against the employee alleging the employee was negligent." *Hughes v. Doe*, 273 Va. 45, 48 (citations omitted). Plaintiff does not need to obtain "a judgment against the employee individually." *Id*. She only needs "a finding that the employee was negligent." *Id*. Accordingly, Corizon is responsible for

the negligence and gross negligence by Nurse Levister.[6]  This includes Nurse Levister failing to immediately call for emergency assistance when she first encountered Mr. Becton, her failure to obtain a proper medication refusal, as well as her other actions and inactions described above. These actions, as well as others, "significantly deviated from the nursing standard of care." Exhibit J (Expert Report of Lori Roscoe), at 9-10.

## V.  There is sufficient evidence in the record for a jury to find that Dr. Ashby and Nurses Ntiamoah and Toy, as well as other Corizon employees, acted negligently.

Simple, or ordinary, negligence is "the failure to use 'that degree of care which an ordinary prudent person would exercise under the same or similar circumstances to avoid injury to another.'" *Griffin v. Shively*, 227 Va. 317, 321 (1984) (quoting *Perlin v. Chappell*, 198 Va. 861, 864 (1957)).

The actions described above of the named Corizon Defendants, as well as other Corizon employees that Corizon is responsible for certainly constitute, at the very least, simple negligence.  The Corizon Defendants seem to acknowledge this as they only argue that Plaintiff's experts are not properly qualified in this matter. *See* ECF 49, at 11-12.  That assertion is baseless, as demonstrated in Plaintiff's Memorandum in Opposition to the Corizon Defendants Motion *in Limine* (ECF 75) and Plaintiff's Memorandum in Opposition to Defendant Smith's Motion to Exclude (ECF 76).  Plaintiff's experts paint a damming picture of the Corizon Defendants' failures and breaches of the standard of care.  Those expert reports are enough to send the issue of simple negligence to the jury.

---

[6] Corizon is also of course responsible under *respondeat superior* for the actions (and inactions) of Defendant Antoine Smith.

**Conclusion**

Mr. Becton spent the last twelve hours of his life in the medical unit at the Jail. Despite his dangerously abnormal vital signs, he was never examined by a doctor or sent to the emergency room. In fact, no medical professional saw him after 7:00 a.m. on October 1, 2020 until he was found dead nine hours later. All claims against Defendants Ashby and Toy, and the simple negligence claim against Defendant Ntiamoah, should be allowed to go to the jury.


MONIQUE SHENELL FORD,
ADMINISTRATOR OF THE ESTATE OF
DARRYL TERRELL BECTON, DECEASED


By:     /s/ Danny Zemel
Counsel


Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
The Krudys Law Firm, PLC
Truist Place
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com; dzemel@krudys.com
Web:   www.krudys.com
*Counsel for Plaintiff*

## Certificate of Service

I hereby certify that on this 12th day of December 2022, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing to all counsel of record.

By: /s/ Danny Zemel
   Counsel

Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
The Krudys Law Firm, PLC
Truist Place
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com;
dzemel@krudys.com
Web:   www.krudys.com
*Counsel for Plaintiff*